## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PAUL G. KING, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-01357 (EGS) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of | ) | |
| Health and Human Services, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MOTION TO DISMISS AMENDED COMPLAINT

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), the defendants move to dismiss the complaint in this action. The basis for this motion is that plaintiffs are challenging administrative action that is not final, and that plaintiffs have not exhausted their administrative remedies, as explained further in the memorandum in support of this motion filed herewith.

Of Counsel:                           Respectfully submitted,

DANIEL MERON                          PETER D. KEISLER
General Counsel                       Assistant Attorney General

SHELDON T. BRADSHAW                   C. FREDERICK BECKNER III
Associate General Counsel             Deputy Assistant Attorney General
Food and Drug Division
                                      EUGENE M. THIROLF
ERIC M. BLUMBERG                      Director
Deputy Chief Counsel, Litigation

SHOSHANA HUTCHINSON
Associate Chief Counsel, Litigation        _____/s/_____
U.S. Dept. of Health & Human Services DRAKE CUTINI
Office of the General Counsel          Attorney
5600 Fishers Lane                     Office of Consumer Litigation
Rockville, MD 20857                   U.S. Department of Justice
301-827-8579                          P.O. Box 386
                                      Washington, D.C. 20044
December 22, 2006                     202-307-0044
                                      Fax: 202-514-8742
                                      drake.cutini@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PAUL G. KING, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civil Action No. 06-01357 (EGS) |
| | ) |
| MICHAEL O. LEAVITT, Secretary of | ) |
| Health and Human Services, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN
OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiffs, several individuals and one advocacy organization, Coalition For Mercury-Free

Drugs ("Comed"), filed a citizen petition with the Food and Drug Administration ("FDA") dated

July 30, 2004, requesting that FDA take numerous measures relating to the use of thimerosal and

other mercury compounds in drug and biologic products regulated by FDA, including revoking

the license and/or approval of all such products that contain mercury. See Amended Complaint

(hereinafter "Am. Compl."), Exh. A.  FDA responded to the citizen petition by letter dated

September 26, 2006, explaining that science did not support plaintiffs' contention that all

products containing thimerosal and other mercury compounds are unsafe. See September 26,

2006, Letter from Jeffrey Shuren to Dr. Paul G. King (hereinafter, "FDA Pet. Resp.," attached

hereto as Tab A).[1]  FDA explained that children today are exposed to very little mercury via

---

[1] FDA has submitted to the Court the entire administrative record of this citizen petition.
FDA's response to that petition is included in that record (at pages 1112-37) and is also attached
to this memorandum for the Court's convenience.  All references in this memorandum to that
response will be to the page numbers of the document itself, rather than to its administrative
record page numbers.

routinely recommended childhood vaccinations because all such vaccines, with the exception of some formulations of the influenza vaccine, are now thimerosal-free. See id. at 4. Moreover, FDA concluded, based on the available scientific evidence, that the benefits associated with products that still contain thimerosal or other mercury compounds outweigh the risks of side effects. See id. at 7-11. Indeed, FDA concluded that granting plaintiffs' requests could result in deaths that would be prevented by allowing the continued use of thimerosal in some products. Id. at 6, 8. After reviewing all of the material submitted with the citizen petition, FDA determined that the materials did not support the petitioners' contention that all products containing thimerosal are unsafe and should be removed from the market. See id. at 11-21. FDA therefore had no grounds on which to revoke the license, or withdraw the approval, of any manufacturers' product containing thimerosal or other mercury, and denied the petition. See id. at 23. Given these findings, the risk-benefit analysis in this case is an easy one.

After this FDA response, plaintiffs submitted a petition for "stay of action" to FDA, asking FDA to reconsider and modify its response to the citizen petition. See Am. Compl. ¶ 24 & Exh. E. That request currently remains pending before the agency. Along with that petition for a stay, plaintiffs submitted material to FDA that had not been before the agency when it reached its decision on the initial citizen petition. Because plaintiffs' petition for stay of action regarding FDA's response to the citizen petition remains pending with FDA and because that petition contains material the FDA has not yet considered, there is no final agency action for this Court to review, and plaintiffs have failed to exhaust the administrative process they initiated. Based on either of these grounds, the Court should dismiss the amended complaint and deny plaintiffs' motion for a preliminary injunction.

2

Even if the amended complaint were properly before the Court, however, and plaintiffs were allowed to challenge FDA's citizen petition response, the motion for a preliminary injunction should be denied. As FDA explained in its response, it reasonably determined that plaintiffs' claims regarding the safety of thimerosal and other mercury compounds are not supported by the evidence. This Court should defer to that scientific assessment. For this reason, plaintiffs have no likelihood of success on the merits of this case, nor do plaintiffs meet the other requirements for preliminary relief. Thus, as explained in greater detail below, this Court should reject plaintiffs' motion and dismiss their complaint.

## BACKGROUND

I.    Statutory And Regulatory Framework

The Public Health Service Act ("PHSA"), 42 U.S.C. §§ 201, et seq., and the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301, et seq., govern the regulation of biological products in the United States.[2] The PHSA governs the licensing of biological products, and grants FDA authority to issue licenses based on a demonstration that the biological product is "safe, pure, and potent," and that the facility in which the product is manufactured "meets standards designed to assure that the biological product continues to be safe, pure, and potent." 42 U.S.C. § 262(a)(2)(C)(i); 21 C.F.R. § 601.20. In order to receive a license, an applicant must provide FDA with, among other things, data derived from clinical and non-clinical studies showing the product's safety, purity, and potency; a description of manufacturing methods; data demonstrating the product's stability; and a representative sample of the product.

---

[2] The PHSA defines biological products as any "virus, therapeutic serum, toxin, antitoxin, vaccine . . . or analogous product . . . applicable to the prevention, treatment, or cure of a disease or condition of human beings." 42 U.S.C. § 262(i).

3

21 C.F.R. § 601.20(a).

As to non-biological drugs, the FDCA mandates that they be approved by FDA before they are marketed. 21 U.S.C. §§ 321(p), 331(d), 355(a). To obtain FDA approval, a drug sponsor must establish, through carefully controlled clinical trials and other data, that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(b); 21 C.F.R. Part 314. During the review and approval process, FDA must also assess the specific ingredients, manufacturing process, strength and dosage form of the drug, specifications related to the drug's containers, exact labeling, and the facilities at which the drug will be manufactured and stored. 21 U.S.C. §§ 355(b)(1)(D), 355(d); 21 C.F.R. § 314.50. Furthermore, all drugs, including biologics, must also be produced and held in accordance with current good manufacturing practice. See 21 U.S.C. § 351(a)(2)(B); 21 C.F.R. Parts 210-11.

II.     Mercury In FDA-Regulated Products

Thimerosal, a mercury compound, is used as a preservative and has been shown to be safe and effective in preventing contamination. See FDA Pet. Resp. at 7, 17. In the 1990s, however, both the awareness of a potential for mercury neurotoxicity and the number of childhood immunizations containing thimerosal increased, raising concerns about potential adverse effects from children's cumulative exposure to mercury in vaccines. See id. at 7. In 1999, FDA conducted a review of thimerosal in childhood vaccines and "found no evidence of harm from the use of thimerosal as a vaccine preservative, other than local hypersensitivity reactions." Id. at 3. The Institute of Medicine's Immunization Safety Review Committee reached a similar conclusion in 2001, based on a review of available data, and again in 2004, after reviewing epidemiological studies that were performed after its 2001 report. See id. at 7-8.

4

Despite these reviews showing a lack of harm from thimerosal use in medications, the Public Health Service (including FDA) concluded that, because it might be difficult to eliminate other environmental sources of mercury and the elimination or reduction of mercury in vaccines is a feasible means of reducing overall exposure, a goal would be established to remove thimerosal from all vaccines routinely given to infants. Id. at 3. To that end, since 2001 all vaccines routinely recommended for children under six years of age have been thimerosal-free, or contain only trace amounts, except for some formulations of the influenza vaccine. See id. at 4. Prior to the initiative to reduce thimerosal in childhood vaccines, the maximum cumulative exposure to mercury in such childhood vaccinations was 187.5 micrograms during the first six months of life. See id. With the introduction of thimerosal-free vaccines, that maximum cumulative exposure was reduced to less than three micrograms. See id. at 4-5. Even if an infant were to receive an influenza vaccine containing thimerosal, the maximum cumulative exposure would still be only 28 micrograms, well below the Environmental Protection Agency's calculated exposure guideline for infants (65 micrograms). See id. at 5.

Adult exposure to mercury has similarly been reduced in recent years. For example, the vaccines for hepatitis B and the Tetanus and Diphtheria toxoids are now available in thimerosal-free formulations. See id. at 5. All licensed plasma derivative products are thimerosal-free, as are all immune globulin preparations, including hepatitis B immune globulin and Rho(D) immune globulin. See id. at 6. Four plasma-derived products (snake and spider antivenoms), that contain ethyl mercury preservatives remain on the market today and must remain until mercury-free substitutes are available. See id. Mercury is also still used in approximately 40 over-the-counter nasal solutions or sprays and five ophthalmic ointment products, but the

mercury exposure from those products is minimal. See id. at 6, 9-11.

III.     Procedural History

Plaintiffs submitted a citizen petition to FDA dated July 30, 2004. See Am. Compl. Exh.

A.  In their petition, plaintiffs requested that FDA:  1) issue an order prohibiting the

administration of any vaccine containing more than 0.5 micrograms per dose of mercury to

children under the age of 36 months and pregnant women; 2) revoke the approval or license of

any drug or biologic that uses thimerosal or any other mercury-based compound as a preservative

or adjuvant unless "the federal government and/or the manufacturer of said medical product can

prove, at its maximum level, its safety and efficacy as a preservative or adjuvant;" 3) issue a

Class I or II "recall and destruction of all batches of multi-dose vaccines and other mercury-

containing drug products" that contain more than 0.5 micrograms of mercury per dose or that

contain approved alternatives that are more than 0.0002 percent mercury; 4) require a "black

box" warning or informed consent regarding products containing thimerosal and other mercury-

based preservatives until such products have been removed from the market; 5) order that all

vaccines containing more than 0.5 micrograms of mercury per dose, and all other drug products

containing more than 1.0 microgram of mercury per milliliter or gram, that remain in commerce

as of January 1, 2006, be recalled and destroyed; and 6) issue a policy that mercury may not be

used as a preservative or other component of any FDA-regulated product that is administered to

humans or animals unless it is first proven to be non-neurotoxic.  Id. at P1-P6.

Plaintiffs filed their initial complaint on August 1, 2006, claiming that FDA had

unreasonably delayed acting on the citizen petition.  Compl. ¶ 1.  FDA responded to the citizen

petition by letter dated September 26, 2006, explaining that all licensed and approved products

containing thimerosal are safe, and that the studies submitted with the petition do not support the petitioners' contention that all products containing thimerosal are unsafe. See FDA Pet. Resp. at 1, 3-21. More specifically, FDA explained: "Since 2001, all vaccines routinely recommended for children 6 years of age and under . . . manufactured for the U.S. market have contained no thimerosal or only trace amounts, with the exception of the inactivated influenza vaccine." Id. at 4. The exposure to mercury in vaccines, for both children and adults, in this country today is minimal, id. at 4-5, and exposure via other biologics and drug products is either non-existent or minimal. See id. at 6. Moreover, FDA determined that the approved products still containing thimerosal are safe, in that the benefits derived from such products are well-established, often life-saving, and outweigh the potential risks to human health. See id. at 6-11.

The citizen petition response also analyzed the studies and other materials on which plaintiffs based their contentions concerning the harmful effects of mercury in FDA-regulated products, and found that the cited materials did not support the petitioners' arguments. See id. at 11-21. FDA determined that "the studies and other documents on which [petitioners] rely do not support your argument that FDA should take action against biologics and other drugs that contain thimerosal. Only a small number of licensed and approved products still contain thimerosal, and the available evidence supports FDA's conclusion that all currently licensed vaccines and other pharmaceutical drug products containing thimerosal are safe." Id. at 23. FDA also concluded that it had "no grounds to revoke the licenses and withdraw the approvals of thimerosal-containing products" or to seek any of the other remedies sought in the petition, and that plaintiffs' claims of a violation of "bodily integrity" lacked merit. Id. at 22-23.

Defendants moved to dismiss the case on October 16, 2006, on the ground that plaintiffs'

7

unreasonable delay claim was moot because FDA had responded to the citizen petition. Plaintiffs filed an opposition to defendants' motion to dismiss on October 25, 2006, and, on the following day, a motion for leave to amend complaint, together with a proposed amended complaint. The proposed amended complaint challenges the substance of FDA's September 2006 citizen petition response, and also appears to continue to assert an unreasonable delay claim. Am. Compl. ¶¶ 8-10.

Also on October 25, plaintiffs submitted to FDA a petition for "stay of action" (exhibit E to plaintiffs' amended complaint). That petition asked FDA to reconsider and modify its denial of the citizen petition. Plaintiffs included with the stay petition numerous attachments that had not been submitted with the citizen petition. See, e.g., Am. Compl. Exh. E, References 12, 18, 20, 22, 24, 26, 27, 34, 35, 39, 40, 47, 55, 56, 57, 59. The petition for stay currently remains pending before FDA.

Defendants filed a reply to plaintiffs' opposition to defendants' motion to dismiss on November 6, 2006, and a response to plaintiffs' motion for leave to amend their complaint on November 9. In these filings, defendants explained that, although they did not oppose plaintiffs' motion to amend, defendants believed that the proposed amended complaint was meritless and subject to resolution by dispositive motion. Defendants also noted their objection to plaintiffs' expressed desire for discovery in this case, stating that any judicial review that occurs in this case will be based on the administrative record and discovery is not appropriate. On November 21, the Court granted leave to file the amended complaint.

On November 20, 2006, plaintiffs filed a motion for a preliminary injunction. In their motion, plaintiffs argue that FDA's response to the citizen petition "completely failed to respond

to the issues raised in the Plaintiffs' Citizen Petition." Pls. P.I. Mem. at 3 ¶ 6. Like their petition

for a stay filed with FDA, plaintiffs' motion for preliminary relief cited to, and included,

materials that were not submitted to FDA during its consideration of plaintiffs' initial citizen

petition. See, e.g., Pls. P.I. Mem. at 1 n.1; at 2 nn. 2-10; and Exhs. 1-10. The motion seeks

various forms of mandatory relief against the FDA with respect to products that contain mercury

or thimerosal. Id. at 9. On November 27, 2006, defendants filed a motion for extension of time

to respond to plaintiffs' filings, in which the parties agreed that defendants would have until

December 22, 2006, to respond to both plaintiffs' amended complaint and motion for a

preliminary injunction, and plaintiffs would then have until January 22, 2007, to respond to

defendants' filings.

## STANDARDS OF REVIEW

I.    Motion To Dismiss

When reviewing a motion to dismiss under Rule 12(b)(1) or (6), "[t]he court must accept

as true all of the plaintiff's well-pled factual allegations and draw all reasonable inferences in

favor of the plaintiff; however, the court does not need to accept as true the plaintiff's legal

conclusions." Arbitraje Casa de Cambio v. USPS, 297 F. Supp. 2d 165, 168 (D.D.C. 2003). See

also Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002) (courts "accept neither 'inferences

drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint,' nor

'legal conclusions cast in the form of factual allegations.'"); Major v. Plumbers Local Union No.

5, 370 F.Supp.2d 118, 123 (D.D.C. 2005) ("Conclusory legal and factual allegations . . . need not

be considered by the court."); Luck's Music Library, Inc. v. Ashcroft, 321 F.Supp.2d 107, 112

(D.D.C. 2004).

9

II.     Motion For Preliminary Injunction

To obtain a preliminary injunction, a party must demonstrate that: (1) it has a substantial

likelihood of success on the merits; (2) it will suffer irreparable injury in the absence of

preliminary relief; (3) other interested parties will not be substantially injured if the requested

relief is granted; and (4) granting such relief would serve the public interest. See Katz v.

Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001). The likelihood of success

requirement is the most important of these factors. Id. Furthermore, the injunctive relief

plaintiffs seek is not merely to preserve the status quo, but to obtain far-reaching mandatory

relief. This type of relief presents "an additional hurdle" and the power to issue such an

injunction "should be sparingly exercised." Mylan Pharmaceuticals, Inc. v. Shalala, 81 F.

Supp.2d 30, 36 (D.D.C. 2000); see also Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir.

1969); see generally Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Bristol-Myers Squibb Co.

v. Shalala, 923 F. Supp. 212, 215 (D.D.C. 1996).

## ARGUMENT

I.     The Amended Complaint Should be Dismissed Because There Has Been No Final
       Agency Action and Plaintiffs Have Not Exhausted Their Administrative Remedies

The Administrative Procedure Act (APA) authorizes review only with respect to "final

agency action." 5 U.S.C. § 704; see also Reliable Automatic Sprinkler Co. v. CPSC, 324 F.3d

726, 731 (D.C. Cir. 2003). FDA's regulations provide: "A request that the Commissioner take

or refrain from taking any form of administrative action must first be the subject of a final

administrative decision based on a petition . . . before any legal action is filed in a court

complaining of the action or failure to act." 21 C.F.R. § 10.45(b). The regulation continues: "If

10

a court action is filed complaining of the action or failure to act before the submission of the

decision on a petition . . . , the Commissioner shall request dismissal of the court action . . . on

the grounds of a failure to exhaust administrative remedies, the lack of final agency action . . . ,

and the lack of an actual controversy . . . ." Id.

On October 25, 2006, plaintiffs filed their petition for "stay of action" with respect to

FDA's response to the citizen petition. See Am. Compl. ¶ 24 & Exh. E. Although plaintiffs'

petition is styled a petition for a "stay," because plaintiffs' initial petition requested that FDA

take various types of mandatory action (primarily revoking approval of various manufacturers'

products), and FDA declined to do so, there is no agency action to "stay." Rather, plaintiffs are

asking FDA to reconsider and modify its response to the citizen petition. Plaintiffs' petition

argues that "many of the statements made in the [FDA response] are clearly at odds with factual

reality and the scientific evidence presented in the petition. . . ." Am. Compl. Exh. E at 3. The

petition contains a 118 page discussion attempting to "refute" the findings made by FDA. See

Am. Compl. Exh. E at S-R-1 to S-R-118. Further, the "stay" petition seeks basically the same

relief as did the initial citizen petition. Compare id. at 2-3 with Am. Compl. Exh. A at P1-P6.

Under FDA regulations, however, because plaintiffs' "petition for stay" included new

materials that were not part of the administrative record of the initial citizen petition, plaintiffs'

petition should have been filed as a new petition. See 21 C.F.R. § 10.30(j) ("A person who

wishes to rely upon information or views not included in the administrative record shall submit

them to the Commissioner with a new petition to modify the decision in accordance with this

section."). Thus, under FDA regulations what plaintiffs have filed is the equivalent of a new

citizen petition that seeks FDA reconsideration and modification of the first citizen petition

response.

In fact, that is exactly what plaintiffs requested in their "petition for stay." It is well-established, however, that a party may not seek judicial review of an agency decision while simultaneously asking the agency to reconsider its decision because "[a] request for administrative reconsideration renders an agency's otherwise final action non-final with respect to the requesting party." Clifton Power Corp. v. Fed. Energy Regulatory Comm'n, 294 F.3d 108, 110 (D.C. Cir. 2002). In ICC v. Brotherhood of Locomotive Engineers, 482 U.S. 270 (1987), the Supreme Court held that, while 5 U.S.C. § 704 might "relieve parties from the requirement of petitioning for rehearing before seeking judicial review," it does not "prevent petitions for reconsideration that are actually filed from rendering the orders under reconsideration nonfinal." Id. at 284-85. See also Stone v. INS, 514 U.S. 386, 392 (1995) (under the APA, "[t]he timely filing of a motion to reconsider renders the underlying order nonfinal for purposes of judicial review.").

In City of New Orleans v. SEC, 137 F.3d 638 (D.C. Cir. 1998), the D.C. Circuit held that "a request for administrative reconsideration of any portion of an agency rule renders the entire rule nonfinal." Id. at 639. "'It is well-established that a party may not simultaneously seek both agency reconsideration and judicial review of an agency's order.'" Id., quoting Tennessee Gas Pipeline Co. V. FERC, 9 F.3d 980, 980 (D.C. Cir. 1993). This is the case even if the petition for reconsideration is filed after the party has filed for judicial review. Wade v. FCC, 986 F.2d 1433, 1434 (D.C. Cir. 1993) ("The danger of wasted judicial effort that attends the simultaneous exercise of judicial and agency jurisdiction . . . arises whether a party seeks agency reconsideration before, simultaneous with, or after filing an appeal or petition for judicial

12

review.") (citations omitted).  The Court in <u>Wade</u> further held:  "So long as a request for agency

reconsideration remains pending, therefore, [the] attempt to seek judicial review must be

dismissed as 'incurably premature.'"  <u>Id.</u>  Moreover, the D.C. Circuit has held that this principle

renders the Court without jurisdiction:  "If a party pursues administrative and judicial relief

concurrently, its petition for judicial review 'will be dismissed for lack of jurisdiction.'"  <u>City of</u>

<u>New Orleans</u>, 137 F.3d at 639, quoting in part <u>Wade</u>, 986 F.2d at 1433.  <u>See also</u> <u>Clifton Power</u>

<u>Corp.</u>, 294 F.3d at 110-11.[3]

    Plaintiffs cannot evade this overwhelming body of case law by attempting to characterize

their petition as one for a "stay" rather than reconsideration.  Regardless of whether their petition

is called a petition for stay or reconsideration, however, they are in fact seeking reconsideration

and modification and this renders the underlying administrative decision non-final.[4]  This is

especially apparent in light of the fact that they have submitted new information that FDA has

not even considered.  Plaintiffs cannot simultaneously seek administrative reconsideration and

judicial review of the same order.  For this reason, their amended complaint should be dismissed.

    Alternatively, the complaint can be dismissed for failure to exhaust administrative

_____

    [3] The D.C. Circuit has also held that lack of finality under the APA is not jurisdictional.
<u>See</u> <u>Reliable Automatic Sprinkler Co.</u>, 324 F.3d at 731.  No matter how this issue is
characterized in the instant case, however, it is clear that plaintiffs challenge non-final action and
their complaint should be dismissed, whether under Federal Rule of Civil Procedure 12(b)(1) or
12(b)(6).

    [4] Under FDA regulations, a petition for reconsideration is not to be based on information
not contained in the administrative record on which the decision was made.  21 C.F.R.
§ 10.33(e).  Thus, as explained above, what plaintiffs have filed is the equivalent of a new
petition seeking FDA reconsideration and modification of its initial citizen petition response.

remedies. See Woodford v. Ngo, 126 S.Ct. 2378, 2384-85 (2006). By filing a request that FDA reconsider and modify its decision rendered in response to their citizen petition, plaintiffs have initiated an administrative proceeding that is not yet complete. They cannot be permitted to abandon that process and seek judicial review, especially in light of the fact that they are relying in that proceeding (and in this Court) on material that was not part of the initial citizen petition. Whether exhaustion is viewed as jurisdictional, see 21 C.F.R. § 10.45(b), or non-jurisdictional, see Avocados Plus, Inc. v. Veneman, 370 F.3d 1243, 1247 (D.C. Cir. 2004), requiring exhaustion in this case furthers the purposes of the exhaustion requirement. For example, exhaustion in this case would promote judicial efficiency by precluding piecemeal judicial review, see McCarthy v. Madigan, 503 U.S. 140, 145 (1992), McKart v. United States, 395 U.S. 185, 193-94 (1969); it would give FDA an opportunity to review plaintiffs' new materials, see Woodford, 126 S.Ct. at 2385, Avocados Plus, 370 F.3d at 1247; and, because plaintiffs have submitted new material to FDA, requiring exhaustion will result in a more useful administrative record for judicial review, see Woodford, 126 S.Ct. at 2385, Avocados Plus, 370 F.3d at 1247. Also, as noted above, FDA's regulations provide that a "request that the Commissioner take or refrain from taking any form of administrative action must first be the subject of a final administrative decision based on a petition . . . before any legal action is filed in a court complaining of the action or failure to act," 21 C.F.R. § 10.45(b), and if "a court action is filed complaining of the action or failure to act before the submission of the decision on a petition," FDA "shall request dismissal of the court action . . . on the grounds of a failure to exhaust administrative remedies . . . ." Id.

14

For these reasons, the claims in plaintiffs' amended complaint should be dismissed.[5]

II.    Plaintiffs Are Not Entitled To A Preliminary Injunction

As demonstrated above, FDA's response to plaintiffs' citizen petition was at one time a "final agency action" but was rendered non-final by plaintiffs' petition for "stay" filed with FDA. Thus, plaintiffs' amended complaint should be dismissed in its entirety, and the Court can dismiss as moot plaintiffs' motion for a preliminary injunction.  Nevertheless, were the Court to examine FDA's citizen petition response in the context of plaintiffs' motion, plaintiffs have failed to satisfy all of the four elements -- a substantial likelihood of success on the merits, irreparable injury, that other interested parties will not be substantially injured by the requested relief, and that granting relief would serve the public interest -- needed to obtain a preliminary injunction.

A.    Plaintiffs Are Not Likely to Succeed On The Merits Because FDA Appropriately Denied The Original Citizen Petition

FDA's administrative decisions are subject to review by the Court under the APA, and

---

[5] Somewhat confusingly, plaintiffs appear to be continuing to assert their unreasonable delay claim. See Am. Compl. ¶ 41 ("Defendants' failure to act on CoMeD Plaintiffs' petition in a manner that complies with all applicable policies, laws and statutes constitutes agency action unlawfully withheld or unreasonably delayed. . . ."); ¶ 43 ("Defendants' failure to reach a decision . . . within a reasonable time . . . has denied CoMeD Plaintiffs their right to timely action. . . ."). Although it is unclear, this may be a challenge to the merits of the citizen petition response. See Am. Compl. ¶ 10 ("Defendants have violated the law by failing to act on the 'CoMeD' petition seeking, inter alia, the withdrawal of marketing approval. . . ."); ¶ 41 ("Defendants' failure to act . . . in a manner that complies with all applicable policies, laws and statutes . . . .") (emphasis added).  To the extent plaintiffs continue to assert an unreasonable delay claim, the law is clear that such a claim is moot and should be dismissed by the Court because FDA has responded to the citizen petition. See McBryde v. Comm. to Review Circuit Council Conduct and Disability Orders of the Judicial Conference of the United States, 264 F.3d 52, 55 (D.C. Cir. 2001); In re Int'l Union, United Mine Workers of Am., 231 F.3d 51, 54 (D.C. Cir. 2000); Action on Smoking and Health v. Dep't of Labor, 28 F.3d 162, 164 (D.C. Cir. 1994); AARP v. EEOC, 823 F.2d 600, 602-03 (D.C. Cir. 1987).

15

may be disturbed only if "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). This standard is highly deferential to the agency.

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). "There is a

presumption in favor of the validity of the administrative action." Bristol-Myers, 923 F. Supp. at

216. Under this "arbitrary and capricious" standard, agency action must be upheld if the action is

rational, based upon relevant factors, and within the agency's authority. Motor Vehicle Mfrs.

Ass'n of the United States, Inc., v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42-42 (1983);

see also Overton Park, 401 U.S. at 416; AT&T Corp. v. FCC, 349 F.3d 692, 698 (D.C. Cir.

2003). Further, "under this narrow scope of review, 'the court is not empowered to substitute its

judgment for that of the agency.'" Bristol-Myers, 923 F. Supp. at 216 (quoting Overton Park,

401 U.S. at 416); see also Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 ("the scope of review under

the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for

that of the agency.").

        In addition, when, as here, agency decisions are based on evaluation of scientific

information within the agency's area of expertise, its decisions are traditionally accorded great

deference. See Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103

(1983); Federal Power Comm'n v. Florida Power & Light Co., 404 U.S. 453, 463 (1972);

Bristol-Myers, 923 F. Supp. at 216. Courts should "proceed with particular caution, avoiding all

temptation to direct the agency in a choice between rational alternatives," when an agency is

evaluating scientific data within its technical expertise. Envtl. Def. Fund, Inc. v. Costle, 578

F.2d 337, 339 (D.C. Cir. 1978); see also Int'l Fabricare Inst. v. EPA, 972 F.2d 384, 389 (D.C.

Cir. 1992) ("The rationale for deference is particularly strong when [the agency] is evaluating

16

scientific data within its technical expertise.").

Such deference has repeatedly been applied in cases under the FDCA. See, e.g.,
Weinberger v. Bentex Pharms., Inc., 412 U.S. 645, 653-54 (1973); Henley v. FDA, 77 F.3d 616,
621 (2d Cir. 1996) ("FDA possesses the requisite know-how to conduct such [scientific]
analyses, by sifting through the scientific evidence to determine the most accurate and up-to-date
information regarding a particular drug . . . . We therefore defer to its reasonable findings. . . .");
Schering Corp. v. FDA, 51 F.3d 390, 399 (3d Cir. 1995) (FDA's "judgments as to what is
required to ascertain the safety and efficacy of drugs fall squarely within the ambit of the FDA's
expertise and merit deference from us."); Tri-Bio Labs., Inc. v. United States, 836 F.2d 135, 142
(3d Cir. 1987) ("in evaluating scientific evidence in the drug field, the FDA possesses an
expertise entitled to respectful consideration by this court"), cert. denied, 488 U.S. 818 (1988).
Courts have been especially deferential to FDA in the context of whether a particular drug meets
the statutory and regulatory requirements for approval. See, e.g., Serono Labs., Inc. v. Shalala,
158 F.3d 1313, 1324 (D.C. Cir. 1998) ("FDA's 'judgments as to what is required to ascertain the
safety and efficacy of drugs fall squarely within the ambit of the FDA's expertise and merit
deference from us.'") (quoting Schering Corp. v. FDA, 51 F.3d 390, 399 (3d Cir. 1995)); see also
Warner Lambert Co. v. Shalala, 202 F.3d 326, 328 (D.C. Cir. 2000); Fisons Corp. v. Shalala, 860
F. Supp. 859, 865 (D.D.C. 1994).

In addition, judicial review is limited to the administrative record, and discovery is not
permitted. See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985); Camp
v. Pitts, 411 U.S. 138, 142 (1973); Citizens to Preserve Overton Park, 401 U.S. at 419;
Commercial Drapery Contractors, Inc. v. United States, 133 F.3d 1, 7 (D.C. Cir. 1998); Texas

17

Rural Legal Aid, Inc. v. Legal Services Corp., 940 F.2d 685, 698 (D.C. Cir. 1991); Common

Sense Salmon Recovery v. Evans, 217 F. Supp. 2d 17, 20 (D.D.C. 2002). For this reason, the

extra-record material cited by plaintiffs should be disregarded by the Court. See Am. Compl.

Exh. E References 12, 18, 20, 22, 24, 26, 27, 34, 35, 39, 40, 47, 55, 56, 57, 59; Pls. P.I. Mem. at

1 n.1; at 2 nn. 2-10; and Exhs. 1-10.

FDA's citizen petition response fully and carefully addressed all of the safety concerns

regarding thimerosal and other mercury compounds that were raised in the original July 2004

citizen petition. After evaluating all of the evidence before it, the comments to the public docket,

and the applicable statutory and regulatory authority, FDA concluded, "the available evidence

supports FDA's conclusion that all currently licensed vaccines and other pharmaceutical drug

products containing thimerosal are safe." FDA Pet. Resp. at 23.

1.    FDA Reasonably Determined That Vaccines And Other Drug Products
Containing Mercury On The Market Today Are Safe

Before approving a non-biologic drug product for marketing, FDA determines whether

the drug is safe and effective for its intended uses. 21 U.S.C. § 355(b). Similarly, FDA may not

approve a biologics license application unless and until the product has been proven safe, pure,

and potent. 42 U.S.C. § 262(a)(2)(C). FDA explained in its citizen petition response that

determining the safety of a product involves weighing the benefits against the risks, because drug

safety is a relative rather than an absolute measurement. See FDA Pet. Resp. at 6-7; see also 21

C.F.R. § 600.3(p) ("The word safety means the relative freedom from harmful effect to persons

affected, directly or indirectly, by a product when prudently administered, taking into

consideration the character of the product in relation to the condition of the recipient as the

18

time."). "If the benefit of the vaccine or other pharmaceutical product outweighs the risk of the

side effects, then FDA finds the product safe." FDA Pet. Resp. at 7.

There are few products on the market today that contain thimerosal or other mercury

compounds. Despite the absence of evidence of harm from the use of thimerosal as a

preservative in vaccines, see id. at 7-8, FDA supports the goal of reducing exposure to mercury

from all sources and, to that end, since 2001 all vaccines routinely recommended for children

under six years of age have been thimerosal-free, or contain only trace amounts of thimerosal,

except some formulations of the influenza vaccine. See id. at 3-4, 7-8. FDA has approved

thimerosal-free formulations for two licensed influenza vaccines, but the amount of thimerosal-

free vaccine currently available is insufficient to vaccinate everyone for whom the vaccine is

recommended. See id. FDA determined that the theoretical risk of harm from the thimerosal in

the influenza vaccine was outweighed by the substantial benefit of being vaccinated against a

potentially life-threatening illness. See id. at 8.

> The goal of reducing mercury exposure from vaccines must be balanced against
> the goal of having enough vaccine available. If FDA now revoked the licenses for
> all thimerosal-containing vaccines, many people would be in serious danger from
> the diseases that those vaccines prevent. That is true even where a thimerosal-free
> formulation of the vaccine exists because at this time manufacturers simply
> cannot produce enough of either formulation for all those who should be
> immunized.

Id. at 5.

Four plasma-derived products (snake and spider antivenoms), that contain ethyl mercury

preservatives remain on the market today, and must remain unless and until mercury-free

substitutes are available due to the health threat posed by the poisonous bites from these animals.

See id. at 6. FDA recognized the real risk of death from an absence of these products which

19

contain small amounts of mercury versus the theoretical risks posed by such products. Id. at 6, 8.

Mercury is also still used in approximately 40 over-the-counter nasal solutions or sprays and five

ophthalmic ointment products, but FDA has concluded that the mercury exposure from those

products is minimal. See id. at 6, 9-11.

FDA properly evaluated the safety of the products challenged in the citizen petition, and

found no grounds for removing those products from the market. FDA Pet. Resp. at 23. This

Court should defer to FDA's reasonable scientific and public health policy analysis in FDA's

field of expertise. Serono Labs., Inc. v. Shalala, 158 F.3d at 1324 ("FDA's 'judgments as to what

is required to ascertain the safety and efficacy of drugs fall squarely within the ambit of the

FDA's expertise and merit deference from us.'"). Courts "review scientific judgments of the

agency 'not as the chemist, biologist, or statistician that we are qualified neither by training nor

experience to be, but as a reviewing court exercising our narrowly defined duty of holding

agencies to certain minimal standards of rationality.'" Troy Corp. v. Browner, 120 F.3d 277, 283

(D.C. Cir. 1997) (quoting in part Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C. Cir. 1976)); see also

Baltimore Gas & Elec. Co., 462 U.S. at 103. FDA's safety determinations here were well-

reasoned and should be upheld.

The case on which plaintiffs primarily rely to support their claim that FDA allegedly

abused its discretion, Berkovitz v. United States, 486 U.S. 531 (1988), is completely irrelevant

here. In Berkovitz, the Supreme Court held that the discretionary function exception to the

Federal Tort Claims Act, 28 U.S.C. § 2680(a), did not bar a suit against the government in which

the plaintiff alleged that the government had failed to comply with the regulatory standards

governing licensing polio vaccines. 486 U.S. at 544. The instant case, however, involves review

20

of an agency decision under the APA.  Thus, the law regarding the Federal Tort Claims Act and

the application of the discretionary function exception have absolutely no relevance here, and

plaintiffs' repeated reliance on that case is unavailing.[6]

    2.    FDA Complied With The FDCA And Its Regulations

Plaintiffs demand that this Court order FDA to revoke the license, or withdraw the

approval, of all licensed or approved products that contain mercury, on the ground that such

products have not been proven safe.  See Am. Compl. ¶¶ 10-12, 14, 16-17, 19, 25-26, p. 18; Pls.

P.I. Mem. at 9.  Plaintiffs also assert that FDA has improperly shifted the burden of proof to

plaintiffs to show that mercury-containing compounds render the products that contain them

unsafe, when the burden should be on the manufacturers and FDA to demonstrate the safety of

mercury as a preservative.  See Am. Compl. ¶¶ 11-12.  These contentions are groundless.

Because the products being challenged in the citizen petition are FDA-licensed and/or

approved, all were demonstrated to be safe prior to receiving approval from FDA.  Thus, the

manufacturers of these products have satisfied their burden of demonstrating the safety of their

products.  Plaintiffs are correct that FDA has the statutory authority to revoke licenses and

withdraw approvals, but only if and when FDA finds, as pertinent to the allegations raised here,

the product to be unsafe.  See 21 U.S.C. § 355(e) (approval of a drug application withdrawn if

evidence "shows that such drug is not shown to be safe for use under the conditions of use upon

the basis of which the application was approved"); 21 C.F.R. § 601.5(b)(1)(vi) (a biologics

license may be revoked if "[t]he licensed product is not safe and effective for all of its intended

---

[6] Even if Berkovitz were relevant, FDA complied with all statutory and regulatory
standards in approving products that contain thimerosal, as explained infra.

uses"). Obviously, prior to taking any such action FDA is required to give notice and an

opportunity for a hearing to the affected manufacturers. See 21 U.S.C. § 355(e); 21 C.F.R. §

601.5(b)(1).

As explained in FDA's citizen petition response, the studies and other evidence in the

citizen petition fail to support plaintiffs' contention that FDA-regulated products containing

mercury are unsafe, see FDA Pet. Resp. at 6-21, and plaintiffs have not demonstrated that FDA's

scientific analysis in the citizen petition is in any way arbitrary and capricious. Thus, "FDA has

no grounds to revoke the licenses and withdraw the approvals of thimerosal-containing

products." FDA Pet. Resp. at 23.[7]

In addition, because plaintiffs appear to be challenging the safety findings underlying

those approvals, plaintiffs bear the burden, as does any party challenging an agency decision, to

show that FDA acted unreasonably. See, e.g., United States Postal Service v. Gregory, 534 U.S.

1, 10 (2001) ("a presumption of regularity attaches to the actions of government agencies"); Nat'l

Small Shipments Traffic Conference, Inc. v. Interstate Commerce Comm'n, 725 F.2d 1442, 1455

(D.C. Cir. 1984) ("Because a presumption of procedural regularity and substantive rationality

attaches to final agency action, aggrieved parties bear the burden of demonstrating to a reviewing

---

[7] The relief plaintiffs seek, a court order that FDA revoke licenses and withdraw approval, is not available under the APA, which provides only that a court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Thus, even if plaintiffs could demonstrate that they should prevail on the merits of this case, the Court could only set aside FDA's decision with respect to the citizen petition and remand the matter to the agency for further proceedings. See, e.g., Palisades Gen. Hosp., Inc. v. Leavitt, 426 F.3d 400, 403 (D.C. Cir. 2005); County of Los Angeles v. Shalala, 192 F.3d 1005, 1011-12 (D.C. Cir. 1999); see also Weinberger v. Bentex Pharms., Inc., 412 U.S. at 653-54 (district courts are not to hold de novo proceedings to decide the safety and efficacy of drugs).

court that challenged agency action merits reversal."); Cape Hatteras Access Preservation

Alliance v. U.S. Dep't of the Interior, 344 F. Supp. 2d 108, 119 (D.D.C. 2004) ("The burden of

proof under the arbitrary and capricious standard is on the party challenging the decision.").

Plaintiffs have wholly failed to meet their burden, as they have not demonstrated deficiencies in

any product approvals or licenses sufficient to overcome the presumption of regularity that

attaches to FDA's performance of its official duties.

Whether or not the burden is on plaintiffs, however, there has been no showing that the

decision reached by FDA is in any way arbitrary and capricious. As explained above, all of the

products being challenged in the citizen petition have been approved by FDA and were

demonstrated to be safe by their manufacturers prior to receiving approval. FDA considered all

of the arguments and material submitted by plaintiffs and concluded that its prior decisions

should not be overturned. Plaintiffs have not come close to showing that this conclusion is

unreasonable in any respect.

Plaintiffs' motion for a preliminary injunction focuses primarily on the influenza vaccine,

some formulations of which still contain thimerosal. FDA's citizen petition response explained

that preservative-free formulations of two licensed influenza vaccines have been approved, see

FDA Pet. Resp. at 4, thus plaintiffs' concerns about the safety of thimerosal are inapplicable to

those formulations.[8] However, as FDA has further explained, the amount of thimerosal-free

vaccine available is currently insufficient to vaccinate all of the children and adults for whom the

---

[8] Plaintiffs' motion also challenges the effectiveness of, and the need for, the influenza vaccine, see Pls. P.I. Mem. ¶¶ 4, 10, 11, 13; however, because these claims were not raised in either the citizen petition nor the amended complaint and are separate and distinct from the claims raised therein, they are beyond the scope of the instant case. See 21 C.F.R. § 10.45(b).

23

vaccine is recommended. See id. FDA determined that, in light of this shortfall, influenza

vaccines containing thimerosal should continue to be marketed at this time because, even for an

infant receiving the thimerosal-containing influenza vaccine, this would result in a maximum

cumulative exposure to mercury that is significantly below the Environmental Protection

Agency's exposure guideline for infants. See id. at 5. Moreover, plaintiffs have failed to support

their claim alleging the "highly dangerous neurotoxic, carcinogenic, and teratogenic effects of

Thimerosal." Pls. P.I. Mem. ¶ 2. Plaintiffs' motion, therefore, lacks support for the

extraordinary relief requested.

Plaintiffs place great reliance on an FDA regulation, 21 C.F.R. § 610.15(a), which they

contend is a minimum standard of proof that mandates safety studies be conducted for all

preservatives used in biologic products. See Pls. P.I. Mem. ¶ 8; Am. Compl. ¶¶ 8, 12, 13, 15, 30-

35.[9] In fact, that regulation – one of many general provisions that apply to all biological

---

[9] Plaintiffs also cite to 21 U.S.C. § 351(a)(2)(B) as authority for their argument that the "safety tests" that they believe FDA must require vaccine manufacturers to conduct are "required by law." Am. Compl. ¶¶ 13-14, 32-34. Section 351(a)(2)(B), however, provides that a drug is deemed to be adulterated under the FDCA if:

> the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess.

This provision clearly does not mandate that certain safety tests be conducted prior to a product being licensed or approved for marketing, and thus does not support plaintiffs' claims to that effect. Because plaintiffs have not alleged problems in the manufacture, processing, packing, or holding of any FDA-regulated products, § 351(a)(2)(B) is inapplicable to this case.

24

products – provides, in pertinent part:

> All ingredients used in a licensed product, and any diluent provided as an
> aid in the administration of the product, shall meet generally accepted
> standards of purity and quality. Any preservative used shall be sufficiently
> nontoxic so that the amount present in the recommended dose of the
> product will not be toxic to the recipient . . . . An adjuvant shall not be
> introduced into a product unless there is satisfactory evidence that it does
> not affect adversely the safety or potency of the product.

21 C.F.R. § 610.15(a). Contrary to plaintiffs' assertions, this regulation is not a "statutory

guideline" and does not – by its own terms – require certain "toxicological proofs" or "studies"

to demonstrate sufficient nontoxicity to all "intended direct and indirect recipients under the

worst-case dosing regimen with some appropriate safety factor." Pls. P.I. Mem. at 4 n.13; see

also Am. Compl. ¶¶ 12, 13 (alleging that 21 C.F.R. § 610.15(a) mandates safety tests). Rather,

the regulation merely articulates the general safety standard by which all ingredients,

preservatives, diluents, and adjuvants in biological products are scientifically evaluated by FDA,

without specifying any method by which safety must be shown. As explained in the citizen

petition response, FDA has found that all vaccines currently being marketed that contain

thimerosal as a preservative are safe. See, e.g., FDA Pet. Resp. at 23. As explained above, this

finding reflects FDA's consideration of various statutory and regulatory provisions and whatever

studies and other materials and proof that were submitted by the manufacturers. The section

cited by plaintiffs does not require specific "proofs" or "studies." Thus, FDA has complied with

21 C.F.R. § 610.15(a) and has not abused its discretion or otherwise "ignored the explicit

requirement for biological drug products set forth" in that regulation. See Am. Compl. ¶ 35. As

a result, that regulation does not support plaintiffs' claims that FDA's response to the petition

was arbitrary and capricious. Also, in addition to the deference given to FDA in matters of

science such as this, agencies are accorded "substantial deference" when interpreting their own regulations. Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994).

### 3.    FDA Complied With The Public Health Service Act

Plaintiffs also contend that FDA has violated 42 U.S.C. § 300aa-27(a), a provision of the Public Health Service Act. See Am. Compl. ¶¶ 8, 18, 36-40; Pls. P.I. Mem. ¶ 14. That statutory provision requires the Secretary of HHS to, in pertinent part, "promote the development of childhood vaccines that result in fewer and less serious adverse reactions than those on the market on the effective date of this part (effective Dec. 22, 1987)," and "make or assure improvements in, and otherwise use the authorities of the Secretary with respect to, the licensing, manufacturing, processing, testing, labeling, warning, use instructions, distribution, storage, administration, field surveillance, adverse reaction reporting, and recall of reactogenic lots or batches, of vaccines, and research on vaccines, in order to reduce the risks of adverse reactions to vaccines." 42 U.S.C. § 300aa-27(a)(1), (2).

FDA has fully complied with this statutory provision with regard to thimerosal as a preservative in childhood vaccines. As explained in FDA's citizen petition response, in furtherance of the Public Health Service's established goal of "removing thimerosal as soon as possible as a preservative from vaccines routinely administered to children," since 2001 all vaccines recommended for use in children, except for the influenza vaccine, are thimerosal-free, or contain only trace amounts of thimerosal. FDA Pet. Resp. at 3-4. As a result, the maximum cumulative exposure to mercury via routine childhood vaccinations during the first six months of life has decreased dramatically, from 187.5 micrograms to less than three micrograms. See id. at 4-5. As for the influenza vaccines, "FDA has approved preservative-free formulations (which

26

contain either no, or only trace amounts of, thimerosal) for two licensed inactivated influenza vaccines that are indicated for children." Id. at 4. In their motion for a preliminary injunction, even plaintiffs acknowledge that "[t]himerosal is no longer used as a preservative in childhood vaccines," and contend that FDA is violating 42 U.S.C. § 300aa-27(a) solely because some formulations of the influenza vaccines still contain thimerosal. Pls. P.I. Mem. ¶¶ 1, 14. Contrary to plaintiffs' reading, see Am. Compl. ¶ 37, this statutory provision does not mandate the complete elimination of all risk of adverse events from childhood vaccines (which is not possible), but rather requires HHS to take steps to "reduce the risks of adverse reactions to vaccines." 42 U.S.C. § 300aa-27(a)(2) (emphasis added). By taking the precautionary measures explained above to reduce children's exposure to mercury from routine vaccinations – despite the absence of evidence of harm from the use of thimerosal as a vaccine preservative – FDA has satisfied the requirements of 42 U.S.C. § 300aa-27(a), and plaintiffs' arguments to the contrary lack merit.[10]

### 4. FDA's Citizen Petition Response Addressed The Issues Raised In The Citizen Petition

Plaintiffs assert that FDA's citizen petition response "failed to address the issues raised in the citizen petition." Am. Compl. ¶ 8. According to plaintiffs, FDA's citizen petition response "addressed a contention that 'all licensed and approved products containing thimerosal are unsafe,'" whereas the citizen petition itself requested FDA to "address the legal issue of lack of the required proof of safety on the part of both the manufacturers and the FDA for all licensed

---

[10] FDA's citizen petition response did not specifically cite to 42 U.S.C. § 300aa-27(a), as plaintiffs point out, see Am. Compl. ¶ 8, but, as explained above, that response letter demonstrates how FDA complied with that statutory provision.

and approved products containing Thimerosal." Id. In their motion for a preliminary injunction,

plaintiffs reiterate this point, arguing: "What the FDA has failed to understand is that the

Plaintiffs' Citizen Petition did not address the issue of vaccine safety, but rather it challenged the

lack of toxicological proof (safety not proven) of Thimerosal-containing vaccines and . . . of

Thimerosal still being used as a preservative in . . . vaccines." Pls. P.I. Mem. ¶ 6.

It is difficult to understand exactly what plaintiffs mean by their argument because, in

asserting that the safety of thimerosal as a preservative in vaccines has not been proven, plaintiffs

are in fact arguing that thimerosal is not safe as a vaccine preservative and, as a result, vaccines

containing thimerosal are unsafe. The majority of the citizen petition – thirty seven out of fifty

two pages – is devoted to describing studies and other sources that purportedly demonstrate the

harmful effects of thimerosal and other forms of mercury to human health. See Citizen Pet. at P-

8 to P-45. The citizen petition then concludes that this so-called lack of proof of safety renders

those FDA-approved vaccines "both unsafe and adulterated." Id. at P-52; see also Am. Compl.

¶ 14 (alleging the level of thimerosal used in vaccines "has not been proven safe," and citing the

statutory provision governing adulterated drugs). Thus, it is clear that the citizen petition did

challenge FDA's findings of safety for all approved vaccines and other drug products that contain

thimerosal, and FDA's citizen petition response squarely addressed those challenges. Plaintiffs'

claim that FDA's response somehow dealt with a question different from that raised in the citizen

petition is puzzling and incomprehensible.

To the extent plaintiffs are now trying to argue that they intended to address only the

safety of thimerosal, and not the safety of the vaccines that contain thimerosal, they exhibit a lack

of comprehension of the approval standards of the FDCA. It is in the nature of the products that

28

FDA regulates that there may be certain risks associated with certain ingredients. However, FDA does not evaluate the separate constituents in a vacuum, but rather evaluates the product as a whole, to determine the risks and benefits of the finished product. See 42 U.S.C. § 262(a)(2)(C)(i); 21 U.S.C. § 355(b).

In sum, in its citizen petition response, FDA responded to plaintiffs' allegations that all vaccines and other drug products containing mercury pose a health risk. Plaintiffs have not demonstrated that the reasoning and analysis in that response letter is arbitrary or capricious. Instead, plaintiffs merely reiterate their central argument from the citizen petition, i.e., that mercury has not been proven safe for use in vaccines and therefore all mercury-containing vaccines should be removed from the market. Mere repetition, without support, does nothing to either advance the claims in plaintiffs' amended complaint nor demonstrate that plaintiffs are entitled to any relief whatsoever. For these reasons, plaintiffs have failed to show a likelihood of success on the merits of this case.[11]

B.    Plaintiffs Will Not Suffer Irreparable Harm Without Injunctive Relief

Plaintiffs have also failed to demonstrate that they will suffer irreparable harm absent preliminary injunctive relief. Indeed, their motion for a preliminary injunction does not even mention irreparable harm. On this basis, their motion for preliminary relief should be denied. See Mylan Pharmaceuticals, Inc. v. Shalala, 81 F.Supp.2d at 42-44.

Courts insist that only irreparable harm justifies the issuance of a preliminary injunction.

---

[11] Because it is clear that plaintiffs' claims are meritless, this case could be resolved on the merits by summary judgment by converting defendants' motion to dismiss to summary judgment under Federal Rule of Civil Procedure 12(b). See also Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) (noting that courts may grant summary judgment sua sponte).

"The *sine qua non* of granting any preliminary injunctive relief is a clear and convincing showing of irreparable injury to the plaintiff." Experience Works, Inc. v. Chao, 267 F. Supp. 2d 93, 96 (D.D.C. 2003). Because plaintiffs are not likely to succeed on the merits, plaintiffs "would have to make a very substantial showing of severe irreparable injury" to prevail on its motion. Nat'l Pharm. Alliance v. Henney, 47 F. Supp. 2d 37, 41 (D.D.C. 1999); see also Apotex, Inc. v. FDA, No. 06-0627, 2006 U.S. Dist. LEXIS 20894 *54 (D.D.C. Apr. 19, 2006). "Irreparabilty of injury is a very high standard." Bristol-Myers, 923 F. Supp at 220. The injury alleged must be certain, great, actual, and imminent, Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), and it must be "more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." Mylan, 81 F. Supp. 2d at 42 (quoting Gulf Oil Corp. v. Dep't. of Energy, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).

Plaintiffs have alleged, in their amended complaint, only speculative harm that they might be suffering, or may suffer in the future, as a result of receiving vaccines containing mercury, see Am. Compl. ¶ 3. As explained above, FDA has essentially eliminated thimerosal from all products when it has been possible to do so. Plaintiffs do not argue, much less demonstrate, that any medications they desire to take are unavailable without thimerosal. In addition, as explained above, FDA has found that the products in question are safe and has thoroughly evaluated plaintiffs' "evidence" and concluded that there are no grounds for initiating proceedings to withdraw approval of the relevant products. Thus, there is simply no basis for a finding of irreparable harm, and plaintiffs fall far short of the showing necessary for a preliminary injunction.

C.     The Requested Relief Will Not Serve The Public

Finally, plaintiffs have also failed to show that any potential harm to their interests in the absence of injunctive relief outweighs the potential harm to other parties, or that the entry of such relief would further the public interest – the third and fourth requirements for preliminary injunctive relief. As explained in FDA's citizen petition response: "The goal of reducing mercury exposure from vaccines must be balanced against the goal of having enough vaccine available. If FDA now revoked the licenses for all thimerosal-containing vaccines, many people would be in serious danger from the diseases that those vaccines prevent." FDA Pet. Resp. at 5. For example, for the four antivenoms (snake and spider) containing ethyl mercury preservatives that remain on the market, FDA concluded: "Removal of the product[s] from the market by the FDA would not be in the best interest of the public health when no substitute products are available, and such an action would be likely to result in severe illnesses and deaths." Id. at 6. The same is true for the influenza vaccine, where deaths and hospitalizations due to influenza have been documented. The public interest weighs heavily in favor of a vaccine that lessens the actual risk of a preventable disease causing serious illness or even death, as opposed to removing the vaccine based on the theoretical, unproven risk of harm from mercury as a preservative in some formulations of the vaccine. See id. at 8. The harm to the public health of removing all mercury-containing products from the market far outweighs the speculative harm to plaintiffs alleged in the amended complaint, further demonstrating that a preliminary injunction is not warranted.

## CONCLUSION

For the foregoing reasons, plaintiffs' complaint should be dismissed, and their motion for

a preliminary injunction should be denied.

Of Counsel:                                  Respectfully submitted,

DANIEL MERON                                 PETER D. KEISLER
General Counsel                              Assistant Attorney General

SHELDON T. BRADSHAW                          C. FREDERICK BECKNER III
Associate General Counsel                    Deputy Assistant Attorney General
Food and Drug Division
                                             EUGENE M. THIROLF
ERIC M. BLUMBERG                             Director
Deputy Chief Counsel, Litigation

SHOSHANA HUTCHINSON
Associate Chief Counsel, Litigation          _____/s/_____
U.S. Dept. of Health & Human Services        DRAKE CUTINI
Office of the General Counsel                Attorney
5600 Fishers Lane                            Office of Consumer Litigation
Rockville, MD  20857                         U.S. Department of Justice
301-827-8579                                 P.O. Box 386
                                             Washington, D.C. 20044
December 22, 2006                            202-307-0044
                                             Fax: 202-514-8742
                                             drake.cutini@usdoj.gov

32