UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PAUL G. KING, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 06-01357 (EGS) |
| ) | |
| MICHAEL O. LEAVITT, Secretary of ) | |
| Health and Human Services, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**INTRODUCTION**

Plaintiffs' memorandum filed in response to the motion to dismiss and opposition to the preliminary injunction filed by the Food and Drug Administration ("FDA"), is a rambling and repetitive discourse that makes clear their disdain for mercury, but has virtually nothing to do with the law applicable to FDA or to the drug approval process (hereinafter plaintiffs' memorandum is cited as "Pl. Mem."). In responding to FDA's motion to dismiss, plaintiffs cite no authority and provide no reasoning rebutting the point that their petition for "stay" rendered the agency decision on their citizen petition nonfinal. At most, they assert that they would "happily" withdraw the petition for a stay if that would make the agency action final. However, they have not withdrawn the petition, and as long as it is pending before FDA the amended complaint remains a challenge to nonfinal agency action and must be dismissed. In addition, plaintiffs have submitted a voluminous amount of extra-record material along with their amended complaint and their motion for a preliminary injunction – and even with their opposition to FDA's motion to dismiss – all of which would have to be ignored or withdrawn if this case were to proceed on the administrative record. In other words, plaintiffs would have to

turn this into a very different case than the one now before the Court in order for it to proceed as an Administrative Procedure Act (APA) case.  For this reason, the most appropriate course of action is simply to do what is requested by FDA – dismiss the amended complaint.

Although the FDA did not intend in this memorandum to respond to plaintiffs' arguments with respect to their motion for a preliminary injunction, plaintiffs have made scurrilous and unfounded allegations, accusing FDA of "colluding" with various manufacturers for the purpose of putting adulterated products on the market.  Plaintiffs cite no authority for these irresponsible accusations, and there is none.  Also, plaintiffs' merits argument reveals a misunderstanding of the law applicable to FDA's approval of drugs and biological products, and this point will also be addressed briefly.

For these reasons, as discussed in greater detail below, plaintiffs' amended complaint should be dismissed and their motion for a preliminary injunction denied.

## ARGUMENT

I. THE COMPLAINT SHOULD BE DISMISSED BECAUSE THERE HAS BEEN NO FINAL AGENCY ACTION AND PLAINTIFFS HAVE NOT EXHAUSTED THEIR ADMINISTRATIVE REMEDIES

As FDA demonstrated in the memorandum in support of its motion to dismiss (hereinafter "U.S. Mem."), plaintiffs' petition for a "stay," which requests that FDA reconsider its September 2006 citizen petition response, renders that response nonfinal agency action. Although FDA cited numerous cases that hold that a request for reconsideration renders the initial agency action nonfinal, U.S. Mem. at 12-13, plaintiffs do not even attempt to rebut those cases.  See Pl. Mem. at 15-16.  Indeed, plaintiffs cite no cases at all in responding to this argument (and cite only one case in their 34-page memorandum).  Plaintiffs simply say – without

citation of authority – that their petition "does not" destroy the finality of the underlying action. Pl. Mem. at 15.  Because plaintiffs provide no authority or even reasoning in support of their argument and do not rebut the abundant precedent holding that a request for reconsideration renders the initial agency action nonfinal, their complaint should be dismissed.

Although plaintiffs correctly state that neither a petition for a stay nor for reconsideration is <u>required</u> to complete exhaustion of remedies, that point is irrelevant.  Pl. Mem. at 15; <u>see also id.</u> at 17.  In fact, that unremarkable proposition is stated in the APA itself, 5 U.S.C. § 704.  However, as held by the many cases cited by FDA, when a party affirmatively seeks reconsideration, that act renders the initial agency action nonfinal.  U.S. Mem. at 12-13.

Plaintiffs baldly state that the petition for a stay "did NOT ask 'the FDA to reconsider and modify its response to the citizen petition.'"  Pl. Mem. at 5.  This statement – without citation to anything – is clearly incorrect, as a review of the petition for "stay" itself reveals.  <u>See</u> Am. Compl. Exh. E (petition for stay).  The <u>only</u> objective of the "stay" petition is reconsideration.  Plaintiffs' petition, on its face, seeks reconsideration of the citizen petition response.  Thus, for example, the petition argues that "many of the statements made in the [FDA response] are clearly at odds with factual reality and the scientific evidence presented in the petition. . . ."  <u>Id.</u> at 3.  The petition contains a 118-page discussion attempting to "refute" the findings made by FDA.  <u>Id.</u> at S-R-1 to S-R-118.  Further, the "stay" petition seeks basically the <u>same relief</u> as did the initial citizen petition.  <u>Compare id.</u> at 2-3 <u>with</u> Am. Compl. Exh. A at P1-P6.  Inasmuch as the initial citizen petition sought revocation of product approvals and that relief was denied, a "stay" of that denial would require the very revocations plaintiffs sought earlier.  Thus, the petition for "stay" seeks reconsideration and renders the initial citizen petition

3

response nonfinal.

Reinforcing this point is the fact that plaintiffs' "stay" petition does not seek a stay of anything – a point conceded by plaintiffs. Because plaintiffs' initial citizen petition requested that FDA take various types of mandatory action (primarily revoking approval of various manufacturers' products), and FDA declined to do so, there is no agency action to "stay." Plaintiffs recognize this: "As a matter of simple logic, you can't 'stay' a decision to do nothing (which is what the Acting Commissioner has done), so our request for a stay has no legal effect, except possibly to update the record." Pl. Mem. at 15.

Plaintiffs also argue that because FDA has treated their petition for a stay as a new citizen petition, "it cannot be used to destroy the finality of the decision in this case." Pl. Mem. at 16; see also id. at 6, 14 n.10. Plaintiffs give no reason for this argument, nor do they cite any authority. This is probably because they cannot do so: Regardless of what their petition is called, what it seeks is reconsideration of FDA's initial citizen petition response, and that is what renders the initial response nonfinal, as numerous cases have held. See U.S. Mem. at 11-13.[1]

Plaintiffs say repeatedly that if the petition for a stay is somehow held to interfere with judicial review, they will "happily withdraw the Petition for Stay" and proceed "on the administrative record that has been filed." Pl. Mem. at 15; see also id. at 5-6, 14, 22. However, they have not withdrawn their petition, which means that they are challenging nonfinal action

---

[1] The reason FDA treated the petition for a "stay" as a new petition is that it included materials that were not in the record of the original petition. U.S. Mem. at 11-12. Plaintiffs argue that this decision is "incorrect," Pl. Mem. at 6, 12; however, whether this decision is correct is irrelevant. Even if the petition for stay were not deemed a "new" petition, because it seeks reconsideration of the original FDA decision, that original decision is nonfinal. U.S. Mem. at 11-13.

and their complaint should be dismissed. In addition, more would be required than "happily" withdrawing the petition for stay. As attachments to virtually every document they have filed in this case, plaintiffs have filed extra-record material. Thus, the amended complaint relies on the petition for stay, which includes a significant amount of material not in the administrative record. See Am. Compl. ¶ 24 and Exh. E, and U.S. Mem. at 8. The motion for a preliminary injunction cites a great deal of material that is not in the administrative record, and all of the exhibits to that motion are extra-record. See Pls. P.I. Mem. at 1 n.1; at 2 nn. 2-10; Exhs. 1-10; U.S. Mem. at 9. Incredibly, plaintiffs have attached yet more extra-record material to their opposition to the motion to dismiss the amended complaint. See Pl. Mem. Exhs. A & C.²

Moreover, plaintiffs' suggestion that they would proceed "on the administrative record that has been filed" is inconsistent with their repeated desire to undertake discovery. Pl. Mem. at 1, 12, 17, 20, 33, 34; see also plaintiffs' proposed Order. As FDA has pointed out, judicial review in this case is limited to the administrative record and discovery is not appropriate. See U.S. Mem. at 17-18; Defendants' Reply in Support of Motion to Dismiss [Original Complaint] at

---

² Plaintiffs argue that their extra-record materials were "in the public domain" when FDA issued its citizen petition denial, and therefore should be part of the record. Pl. Mem. at 17. Again, plaintiffs provide no citation of authority for this unique proposition, and this argument is inconsistent with FDA's definition of administrative record. See 21 C.F.R. § 10.3(a) ("Administrative record means the documents in the administrative file of a particular administrative action on which the Commissioner relies to support the action."); see also Fund for Animals v. Williams, 245 F. Supp.2d 49, 55-57 (D.D.C. 2003), aff'd in part, vacated in part on other grounds, 428 F.3d 1059 (D.C. Cir. 2005). In addition, if this material were available, plaintiffs obviously could have placed it before FDA in the citizen petition proceeding. See id. § 10.30(g) ("A petitioner may supplement . . . a petition in writing without agency approval . . . at anytime until the Commissioner rules on the petition . . . ."). FDA does not argue, as stated by plaintiffs, that the record is limited to materials "available" to FDA before the original citizen petition was filed, Pl. Mem. at 12. The record is limited to the material relied upon by FDA when the decision was made, and that is the record that has been submitted to the Court. See 21 C.F.R. § 10.3(a).

2 n.2, filed Nov. 6, 2006; Defendants' Response to Plaintiffs' Motion for Leave to Amend Complaint at 2-3, filed Nov. 9, 2006.

It is obvious that even if plaintiffs were to "withdraw" their petition for a stay and proceed on the administrative record that has been filed, the result would be a case that looks very different from the one now before the Court. All of plaintiffs' extra-record material would have to be withdrawn and, in all likelihood, the amended complaint and motion for preliminary injunction as well. Hence, the most appropriate course of action would be that suggested by FDA – dismiss the amended complaint and deny the motion for preliminary injunction.

Finally, plaintiffs argue that although FDA's position on the merits of its citizen petition response "might be an appropriate subject for a motion for summary judgment, it can never be the basis for a motion to dismiss." Pl. Mem. at 16. Although FDA does not necessarily agree with this position, the FDA has not argued that this case should be dismissed based on the merits of the citizen petition response. Rather, the motion to dismiss is based on the lack of finality and failure to exhaust. See U.S. Mem. at 10-14. The FDA has, however, discussed the merits of the citizen petition response in demonstrating that plaintiffs have no likelihood of success on the merits of their motion for a preliminary injunction.[3]

II.     PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

FDA did not intend to discuss the merits of plaintiffs' motion for a preliminary injunction in this reply memorandum; however, the government believes that it should address briefly several inflammatory and untrue statements and some misunderstandings in plaintiffs'

---

[3] In fact, FDA pointed out that plaintiffs' complaint is so meritless that judgment could be rendered for FDA by converting the motion to dismiss to summary judgment. U.S. Mem. at 29 n.11.

memorandum. First, plaintiffs allege repeatedly that FDA "is colluding" with the manufacturers of vaccines that contain thimerosal in order to "permit them to produce and market adulterated drugs." Pl. Mem. at 7. See also id. at 9 (FDA "knowingly approved . . . compounds that were adulterated. . . ."); 10 (FDA's action "borders on being criminal."); 20 (FDA is "acting in concert" with manufacturers "engaged in the distribution of adulterated drugs."); 23 (FDA has "knowingly colluded with the manufacturers . . . to, among other things, knowingly distribute drugs that are adulterated."); 24 (FDA has "knowingly cooperated with these manufacturers in the approval and distribution of these adulterated Thimerosal-preserved vaccines. . . ."); 32 (FDA's "knowingly false statement" and "knowing and collusive" actions). These comments are provided with no citation whatsoever, and these irresponsible statements reflect a careless and thoughtless disregard for the truth.

In addition, these comments reflect plaintiffs' basic misunderstanding of the drug approval process and the law applicable to FDA. As explained in FDA's initial memorandum, all of the vaccines that contain thimerosal that are on the market today went through FDA's thorough and arduous approval process and were found to be safe for their intended uses. U.S. Mem. at 18-20. This approval process requires the submission of, among other things, extensive data, including data derived from clinical studies, demonstrating product safety. Id. at 3-4.[4]

Plaintiffs' primary argument, repeated over and over, is that FDA is violating one of its own regulations (21 C.F.R. § 610.15(a)), by not conducting or requiring specific testing of thimerosal or mercury. Plaintiffs contend that this regulation is a "legally binding biological

---

[4] Contrary to plaintiffs' assertion, FDA does not conduct these studies, see Pl. Mem. at 14, but reviews studies that manufacturers are required to provide. See, e.g., 21 C.F.R. § 601.2(a).

standard" that requires certain mandatory studies to demonstrate nontoxicity of thimerosal.  Pl. Mem. at 23; see also id. at 4, 5, 7, 8, 9, 11 n.8, 20, 24, 25, 26, 29, 30, 31, 32.  Significantly, plaintiffs are asserting that FDA is mistaken in interpreting its own regulation; however, FDA is given wide deference when interpreting its own regulations, particularly on matters of science.  See U.S. Mem. at 16-17, 25-26.

Even if no deference were given to FDA, plaintiffs' assertions would be rejected because they reflect an incorrect reading of the regulation, which does not even mention mercury.  The regulation only requires that any preservative contained in a biological product be at such levels that the finished product itself, when used at the recommended dose, is not toxic to the recipient.  The regulation, one of many general provisions that apply to all biological products, states, in pertinent part:  "Any preservative used shall be sufficiently nontoxic so that the amount present in the recommended dose of the product will not be toxic to the recipient."  21 C.F.R. § 610.15(a).

Thus, this regulation, by its own terms, recognizes that preservatives are not to be examined in isolation, as plaintiffs argue, but are examined in the context of the overall product and the recommended dose.  Hence, the very terms of this regulation defeat plaintiffs' primary argument (essentially their sole argument) that testing of individual ingredients is required.  This regulation gives FDA wide discretion, and does not require specific testing of individual ingredients, does not specify a particular method by which safety must be shown, and does not even define what is meant by "sufficiently nontoxic."  Nothing in the FDCA nor the PHSA

requires the specific testing urged by plaintiffs.[5]

As FDA explained in its thorough response to plaintiffs' citizen petition, FDA analyzes products on the basis of their relative safety, and based on the available scientific evidence, has found that all of the products on the market today that contain thimerosal are safe and that the benefits associated with products that contain thimerosal or other mercury compounds outweigh the risks of side effects. See FDA Pet. Resp. at 7-11. In coming to this conclusion, FDA noted that science did not support plaintiffs' contention that all products containing thimerosal and other mercury compounds are unsafe or have not been "proven safe."

Although plaintiffs argue repeatedly that FDA has presented no proof or "scientific data," see Pl. Mem. at 20; see also id. at 3 n.1, 6, 7, 13 14, 22, 26, 27, 32, FDA's citizen petition response more than adequately responded to the questions presented by plaintiffs and examined a significant amount of scientific data, including that submitted by plaintiffs. The available scientific evidence included information that FDA obtained through a comprehensive review of the use of thimerosal in childhood vaccines. See FDA Pet. Resp. at 3. The review found no

---

[5] Similarly, FDA regulations give FDA wide discretion with respect to the "black box" warning sought by plaintiffs. See Pl. Mem. at 29. Black box warnings are designed to highlight for health care professionals special problems or contraindications associated with a drug or biologic product. The regulation, 21 C.F.R. § 201.57(c)(1), states, in pertinent part: "Certain contraindications or serious warnings, particularly those that may lead to death or serious injury, may be required by the FDA to be presented in a box." (emphasis added). As with § 610.15(a), § 201.57(c)(1) is a general statement of the factors FDA may consider in determining whether the safety issues associated with a product warrant a black box warning.

Even when toxicology studies are mentioned in other contexts, such as in the regulation on the content and format of an Investigational New Drug ("IND") application, the regulation gives the IND sponsor discretion to use whichever approach or testing method is appropriate for a particular product. The regulation, 21 C.F.R. § 312.23(a)(8), states that the "kind, duration, and scope of animal and other tests required varies with the duration and nature of the proposed clinical investigations."

evidence of harm from the use of thimerosal as a vaccine preservative, other than local hypersensitivity reactions. The results of that review were published in a peer-reviewed medical journal, see Ball LK, et al., An Assessment of Thimerosal Use in Childhood Vaccines, *Pediatrics* 107(5):1147-54 (2001), and FDA included that article in the record. See A.R. 001146-001154. As the article makes clear, FDA's assessment was adapted from a paradigm outlined by the National Research Council, and consisted of hazard identification, dose-response assessment, and risk characterization. Id. at 1148. The article explains in detail how FDA performed each element of that assessment and summarized the results.

Furthermore, as FDA also pointed out in its citizen petition response, numerous later studies have found no link between thimerosal-containing vaccines and autism-spectrum neurological disorders. FDA Pet. Resp. at 7-8. Specifically, FDA noted "data from Denmark and Sweden, where exposure to thimerosal in vaccines was eliminated in 1992 and where autism rates continued to increase." Id. at 8. FDA included in the administrative record other studies that reached this same conclusion. See A.R. 001351-56; 001412-29; and 001430-43. Plaintiffs simply refuse to accept the conclusions of the peer-reviewed studies cited by FDA. The administrative record plainly demonstrates that FDA made its determination after evaluating the available scientific evidence, including that presented by plaintiffs. Even if plaintiffs disagree with the determination that FDA reached, they have no basis to claim that FDA acted in a manner that is contrary to law or arbitrary and capricious.

Having determined that thimerosal-containing products are safe and that the thimerosal preservative in licensed vaccines is sufficiently nontoxic so that the amount present in the recommended doses of those vaccines will not be toxic to the recipient, FDA had no grounds on

which to revoke the license, or withdraw the approval, of any manufacturer's product containing thimerosal or other mercury, and denied the petition. See id. at 23. Accordingly, no matter how plaintiffs attempt to characterize the issue, i.e., they claim to be arguing that safety "was not proven," not that the products "were unsafe," Pl. Mem. at 2, 7, 13, 27, their contention was properly rejected by FDA, and plaintiffs have no likelihood of demonstrating that response to be arbitrary and capricious under the APA.[6]

The only case cited in plaintiffs' 34-page memorandum is Berkovitz v. United States, 486

---

[6] FDA noted that all non-flu vaccines routinely recommended for children under age 6 years now contain no thimerosal or only trace amounts, and there are flu vaccines that contain no or only trace amounts of thimerosal. FDA Pet. Resp. at 4. Also, flu vaccines were not recommended for children under 23 months until 2004 (and even later than that for children ages 23 months to 59 months), and FDA is in discussions with manufacturers to increase their capacity to produce thimerosal-free flu vaccines. Id. at 4-5. Although plaintiffs argue that FDA's decision is inconsistent with a desire to remove mercury from vaccines, see, e.g., Pl. Mem. at 16, plaintiffs' position is not only inconsistent with the law – as outlined above – it does not reflect reality. Plaintiffs seem to believe that because some manufactures have been licensed to make influenza vaccines that do not contain thimerosal as a preservative, manufacturers could easily produce millions of doses of the thimerosal-free vaccine instantly. See Pl. Mem. at 4-5, 11, 16, 26. Unlike other products, significant volumes and doses of influenza vaccines have to be manufactured and filled within a very short period of time to be available for each annual influenza season. Influenza vaccines without the preservative thimerosal require single-dose vials, and the currently available single-does vial filling line capacity is not sufficient to produce enough influenza vaccine. Increasing that capacity requires building new plants, or at least installing new production equipment in existing plants. It also requires validating all processes and qualifying all equipment, training additional personnel, and accomplishing all the other tasks necessary to increase production. Although FDA is in discussions with manufacturers about increasing their capacity to produce influenza vaccines without thimerosal as a preservative, doing so requires some time and revoking the existing licenses would create a vaccine shortage.

Thus, FDA recognized: "The goal of reducing mercury exposure from vaccines must be balanced against the goal of having enough vaccine available. If FDA now revoked the licenses for all thimerosal-containing vaccines, many people would be in serious danger from the diseases that those vaccines prevent." FDA Pet. Resp. at 5. In addition, approved products that contain thimerosal cannot be removed from the market because they have not been shown to be unsafe, and FDA would have to provide notice and hearings in order to remove such products. See U.S. Mem. at 21-22.

11

U.S. 531 (1988). See Pl. Mem. at 4, 20, 22, 23, 24. As discussed in FDA's initial memorandum, Berkovitz involved the Federal Tort Claims Act – not the APA – and is completely irrelevant. U.S. Mem. at 20-21. Plaintiffs' repeated citation of Berkovitz again reflects a misunderstanding of the nature of this case. If this case were not dismissed, judicial review would be under the APA and would be based on the administrative record, and the role of the Court would be to determine whether FDA's citizen petition response is arbitrary and capricious. See U.S. Mem. at 22 n.7. The Court would not hold a hearing or trial, as plaintiffs envision, see Pl. Mem. at 14 n.11, 15, 18, 20, 33, on the safety of various previously-approved products. See U.S. Mem. at 22 n.7.

## CONCLUSION

For the foregoing reasons and the reasons stated in the defendants' initial memorandum, plaintiffs' complaint should be dismissed, and their motion for a preliminary injunction should be denied.

| | |
|---|---|
| Of Counsel: | Respectfully submitted, |
| DANIEL MERON<br>General Counsel | PETER D. KEISLER<br>Assistant Attorney General |
| SHELDON T. BRADSHAW<br>Associate General Counsel<br>Food and Drug Division | C. FREDERICK BECKNER III<br>Deputy Assistant Attorney General |
| ERIC M. BLUMBERG<br>Deputy Chief Counsel, Litigation | EUGENE M. THIROLF<br>Director |
| VERNESSA T. POLLARD<br>Associate Chief Counsel, Litigation<br>U.S. Dept. of Health & Human Services<br>Office of the General Counsel<br>5600 Fishers Lane<br>Rockville, MD  20857<br>301-827-6535<br><br>February 9, 2007 | _____/s/_____<br>DRAKE CUTINI<br>Attorney<br>Office of Consumer Litigation<br>U.S. Department of Justice<br>P.O. Box 386<br>Washington, D.C. 20044<br>202-307-0044<br>Fax: 202-514-8742<br>drake.cutini@usdoj.gov |